IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


**JACKIE C. SHANE**,

       Plaintiff,

vs.                                          **CIV. NO.  01-194 MCA/WWD**

**BRYAN KILLINGER** and
**ERIC GARCIA**, in their
individual capacities, and the
**CITY OF ALBUQUERQUE**,

       Defendants.


## MEMORANDUM OPINION AND ORDER


**THIS MATTER** comes before the Court on ***Defendants' Motion for Partial Summary Judgment Requesting Dismissal of Plaintiff's Municipal Liability Claim and of her Claims Against Defendant Garcia*** (Doc. No. 95); ***Defendant Bryan Killinger's Motion for Summary Judgment*** (Doc. No.92); ***Defendant City of Albuquerque's Motion for Separate Trials*** (Doc. No. 97); and ***Defendant Bryan Killinger's Motion to Bifurcate Trial*** (Doc. No. 90).  Having reviewed the submissions of the parties, the relevant law, and otherwise being fully advised in the premises, the Court finds that ***Defendants' Motion for Partial Summary Judgment Requesting Dismissal of Plaintiff's Municipal Liability Claim and of her Claims Against Defendant Garcia*** is well taken and is, therefore, **GRANTED**; ***Defendant Bryan Killinger's Motion for Summary Judgment*** is **DENIED**; ***Defendant City***

*of Albuquerque's Motion for Separate Trials* is **DENIED**; and ***Defendant Bryan Killinger's Motion to Bifurcate Trial*** is **DENIED** as moot.

**I.**     **BACKGROUND**

On February 16, 2001, Plaintiff Jackie Shane filed her *Complaint* (Doc. No. 1) in this Court against Defendants Bryan Killinger and the City of Albuquerque alleging civil-rights violations and tort claims under state law.   Plaintiff's *Complaint* asserts that, in his capacity as an officer of the Albuquerque Police Department (APD), Defendant Killinger unlawfully detained her and used excessive force in violation of the Fourth and Fourteenth Amendments to the United States Constitution and the common law of the State of New Mexico. Plaintiff's *Complaint* further asserts that the City is liable for violating her civil rights under 42 U.S.C. § 1983 and for her tort claims under state-law theories of *respondeat superior* and negligent retention, training, and supervision.   The allegations in Plaintiff's *Complaint* were the subject of a summary-judgment motion (Doc. No. 17), which was denied by the Honorable Martha Vazquez in a *Memorandum Opinion and Order* filed on September 17, 2001. (Doc. No. 30.)   Defendants' appeal from Judge Vazquez's *Memorandum Opinion and Order* was dismissed by the Tenth Circuit on October 30, 2001.   (Doc. No. 33).

After this Court received the mandate from the Tenth Circuit, Plaintiff moved to amend her Complaint (Doc. No. 50) and was granted leave to do so.   (Doc. No. 67.) Plaintiff's *Amended Complaint* (Doc. No. 73) added Sergeant Eric Garcia as a Defendant on the grounds that Sergeant Garcia was Defendant Killinger's supervisor during the relevant

time period.  Plaintiff's claims against Sergeant Garcia were later dismissed by stipulation of the parties.  (Doc. No. 112.)

There remain two dispositive motions in this case which are pending before this Court:  a motion for partial summary judgment on Plaintiff's claim of municipal liability filed by the City of Albuquerque on October 22, 2002 (Doc. No. 95), and a second summary-judgment motion filed by Defendant Killinger on October 15, 2002 (Doc. No. 92).  The undisputed facts and evidence of record regarding these motions can be summarized in the light most favorable to Plaintiffs as follows.

On November 12, 2000, Defendant Bryan Killinger was driving his police vehicle in the vicinity of Lomas Boulevard and Alvarado Street in Albuquerque, New Mexico.  There was a stop sign at the intersection of Lomas and Alvarado which directed the traffic on Alvarado to stop at Lomas.  As Defendant Killinger was driving southbound on Alvarado toward the intersection with Lomas, Plaintiff was riding her bicycle northbound on Alvarado toward Lomas.  (Killinger Dep. 5-20-02, at 5-6; Shane Dep. at 51-52.)

Plaintiff contends that she stopped at the stop sign at the intersection of Lomas and Alvarado.  She further contends that, as she proceeded toward the intersection, she observed Defendant Killinger in front of her making a left-hand turn from the southbound lane of Alvarado to the eastbound lane of Lomas without using his turn signal.  Plaintiff stopped and hollered at Defendant Killinger regarding his failure to use his turn signal.  (Shane Aff. 6-4-01, ¶¶ 3-6; Shane Aff. 10-30-02, ¶ 5; Shane Dep. at 53-56; Garcia Dep. at 6.)

Defendant Killinger made a U-turn and drove back to the location where Plaintiff had stopped her bicycle. As he approached her and asked "what did you say," she responded with a statement to the effect that she wanted him to use his turn signal. A brief conversation ensued in which Plaintiff protested Defendant Killinger's failure to use his turn signal, and Defendant Killinger responded by accusing Plaintiff of not coming to a complete stop at the stop sign. Plaintiff denied running the stop sign. Defendant Killinger asked her for identification. She initially declined to provide her name. When Defendant Killinger persisted with this line of questioning, Plaintiff gave a fictitious name and attempted to leave the scene. (Shane Aff. 6-4-01, ¶¶ 7-11; Shane Dep. at 59-62, 65-66, 73-74, 146; Ex. D to Def. Killinger's Mem. at 3-5.)

Defendant Killinger physically prevented her from doing so. Plaintiff alleges that Defendant Killinger grabbed her by the head, threw her bicycle to the ground, stepped on the bicycle, and pushed her to the ground as she tried to pick it up. She further alleges that as she got up, Defendant Killinger pushed on her chest and struck her breast. Ultimately, Plaintiff was arrested and handcuffed. (Shane Aff. 6-4-01, ¶¶ 11-15, 19; Shane Dep. at 65-70, 75, 157-58, 160-62.)

Defendant Killinger contacted his supervisor, Sergeant Eric Garcia, who arrived at the scene after Plaintiff was handcuffed. Plaintiff was detained for approximately forty-five minutes and then released. She did not receive any citations. (Shane Aff. 6-4-01, ¶¶ 21, 24-25; Garcia Dep. at 4-6).

-4-

Plaintiff contends that Defendant Killinger and other APD officers have engaged in other incidents of excessive force in the past, and that the City has a policy or custom of condoning these incidents by allowing the officers in question to remain on the police force without adequate supervision, training, or discipline.  To support these allegations, Plaintiff primarily relies on evidence regarding a well-publicized prior incident in which Defendant Killinger was disciplined for using excessive force, and the fact that Defendant Killinger's immediate supervisor, Sergeant Garcia, was not informed of prior complaints against Defendant Killinger.  (Killinger Dep. 9-9-02, at 3-13, 58-60; Garcia Dep. at 9.)

## II.   ANALYSIS

### A.   Standard of Review

Summary judgment under Fed. R. Civ. P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ."  Fed. R. Civ. P. 56(e).  Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial."  Id.  Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

-5-

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324. It is not the court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

When an individual defendant raises the affirmative defense of qualified immunity in a summary-judgment motion, the burden shifts to the plaintiff to establish that the defendant's actions violated a constitutional or statutory right and that the right at issue was clearly established at the time of the defendant's unlawful conduct.  See Gross v. Pirtle, 245 F.3d 1151, 1155-56 (10th Cir. 2001).  If the plaintiff fails to meet this burden, then the Court must grant the defendant qualified immunity.  See id. at 1156.  If the plaintiff does establish the violation of a clearly-established constitutional or statutory right, then (for purposes of the defendant's summary-judgment motion) the burden shifts to the defendant to prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.  See id.

**B.**   ***Defendant Bryan Killinger's Motion for Summary Judgment***

42 U.S.C. § 1983 provides, in relevant part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Persons sued in their individual capacity under this federal civil-rights statute generally are entitled to qualified immunity unless it is shown that their actions violated a specific statutory or constitutional right and that the rights which they allegedly violated were clearly established at the time of the conduct at issue.  See Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).

In this case, the constitutional right at issue is the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  In her *Amended Complaint*, Plaintiff contends that Defendant Killinger violated her Fourth Amendment rights by unlawfully detaining her and using excessive force in the vicinity of Lomas Boulevard and Alvarado Street on November 12, 2000.

When, as here, a defense of qualified immunity is raised by an individual Defendant in the context of the Fourth Amendment, the Court applies two distinct standards of reasonableness.  First, in determining whether an individual defendant's actions violated a specific right, the Court must decide whether the defendant conducted a search or seizure

that was "unreasonable" under the Fourth Amendment.  Second, if such a violation is found, then in determining whether the constitutional right at issue was clearly established at the time of the search or seizure, the Court must answer the additional question of whether the contours of the right were "sufficiently clear that a reasonable official would understand that what he [did] violate[d] that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987); accord Saucier v. Katz, 533 U.S. 194, 203-04 (2001).

### 1.    **Unlawful Detention**

For purposes of analyzing Fourth Amendment issues, the Tenth Circuit has employed a framework that divides interactions between police and citizens into three categories: consensual encounters, investigative stops, and arrests.  See Oliver, 209 F.3d at 1186.  As indicated by the authorities cited below, an individual's right to be free from warrantless arrests and investigative stops that do not comport with this framework is clearly established.

A consensual encounter occurs when a police officer simply approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and end the encounter.  Such encounters "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing."  Id.

An investigative stop occurs when an officer stops and briefly detains a person "'in order to determine his identity or to maintain the status quo momentarily while obtaining more information.'"  Id. (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).  Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements in order to be considered "reasonable" under the Fourth

Amendment.  First, the officer "'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'"  Id. (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. 1, 20 (1968), because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out" in this context, United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001) (en banc).

An arrest is a seizure that is "'characterized by highly intrusive or lengthy search or detention.'"  Oliver, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)).  Inasmuch as an arrest exceeds the limited scope or duration of an investigative stop, it must be supported by probable cause.  "'Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense.'"  Id. (quoting Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)).

Under the Fourth Amendment, "the standard of probable cause 'applie[s] to all arrests, without the need to "balance" the interests and circumstances involved in particular situations.'"  Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001) (quoting Dunaway v. New York, 442 U.S. 200, 208 (1979)).  Further, the subjective motivations of the officer performing the arrest are not relevant to determining whether that arrest is "reasonable" under the Fourth Amendment.  See Arkansas v. Sullivan, 532 U.S. 769, 771-72 (2001).

In this case, the Court concludes that Plaintiff's interaction with Defendant Killinger in the vicinity of Lomas Boulevard and Alvarado Street on November 12, 2000, began as a consensual encounter. According to the undisputed facts and evidence presented by Plaintiff, she voluntarily stopped at the intersection and hollered at Defendant Killinger regarding his failure to use a turn signal. Although Plaintiff felt obliged to wait for Defendant Killinger when he returned to the scene in his vehicle, the evidence does not indicate that he engaged his emergency lights, issued any commands over his vehicle's PA system, or took other action that would lead a reasonable person to believe that he or she was not free to leave at the time the encounter began. (Shane Dep. at 59-62.)

According to Plaintiff's deposition testimony, the first question Defendant Killinger asked her upon returning to the intersection was: "What did you say?" Her response was: "I asked you to use your turn signal," or something to that effect. Defendant Killinger then asked Plaintiff: "What is your name?" Plaintiff declined to provide that information. When Defendant Killinger persisted in this line of questioning, Plaintiff gave a fictitious name and attempted to leave the scene. Defendant Killinger physically prevented her from doing so. (Shane Dep. at 59-62, 65-70, 73-74, 146, 157-58.)

At the time Plaintiff initially declined to provide her name, the situation became an investigative detention. The investigative detention of a vehicle is "reasonable" under the Fourth Amendment "'if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'" United States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001) (quoting

-10-

United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)).  This principle applies with equal force to the investigative detention of a bicyclist inasmuch as the New Mexico Motor Vehicle Code affords a "person riding a bicycle upon a roadway" the same rights and obligations as the driver of a motor vehicle.  N.M. Stat. Ann. § 66-3-702 (Michie 1978 & Supp. 2001).  One such obligation is to stop at stop signs.  See N.M. Stat. Ann. § 66-7-345(C) (Michie 1978 & Supp. 1998).  Accordingly, if Defendant Killinger actually observed or reasonably suspected that Plaintiff had committed a traffic violation by not coming to a complete stop at a stop sign, then the investigative detention was justified at its inception.

When viewed in the light most favorable to Plaintiffs, however, the evidence of record in this case does not necessarily establish that an observed or reasonably suspected stop-sign violation provided an objective basis for Defendant Killinger's investigative detention of Plaintiff.  Plaintiff has consistently maintained that she came to a complete stop at the intersection.  (Shane Aff. 6-4-01, ¶¶ 4-5; Shane Aff. 10-30-02, ¶ 5; Shane Dep. at 53-54; Ex. D to Def. Killinger's Mot. at 3; Garcia Dep. at 6.)  Defendant Killinger, on the other hand, has offered several different accounts of his actions that may appear inconsistent or implausible when viewed in the light most favorable to Plaintiff.  While Defendant Killinger's subjective motivations are not relevant to determining whether the detention was "unreasonable" under the Fourth Amendment, see Sullivan, 532 U.S. at 771-72, the inconsistencies in his various accounts of what happened create a genuine issue as to whether

the information on which he relied was "reasonably trustworthy," see Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10th Cir. 1998).

In his affidavit dated May 1, 2001, that was submitted as Exhibit B to Defendants' first summary-judgment motion (Doc. No. 17), Defendant Killinger claims that he made a left turn from the southbound lane of Alvarado to the eastbound lane of Lomas *after* he observed Plaintiff travel through the intersection without coming to a complete stop. (Killinger Aff. ¶¶ 8-10.)  Viewing the evidence in the light most favorable to Plaintiff, this scenario may appear to be implausible inasmuch as Plaintiff would not have had occasion to observe Defendant Killinger's failure to use a turn signal if she had already proceeded through the intersection before he made his turn, and Defendant Killinger would not have had occasion to see in his rear-view mirror that Plaintiff was waving at him from the median in the middle of the intersection if she had already proceeded through the intersection before he made his turn.

In his deposition testimony attached to the parties' briefs regarding his second summary-judgment motion (Doc. No. 92), Defendant Killinger instead claims that he made his left turn onto Lomas *before* Plaintiff proceeded through the intersection on her bicycle but that he remained in a position to continuously observe her approach to the intersection by looking back through his passenger-side window as he was completing his turn. (Killinger Dep. 5-20-02, at 10-11.)  Viewing the evidence in the light most favorable to Plaintiff, this scenario may appear to be implausible inasmuch as Plaintiff could not have proceeded through the intersection in full view of Defendant Killinger if he made a left turn

onto Lomas before she reached the intersection, and Defendant Killinger could not have obtained a continuous view of Plaintiff as she approached the intersection unless, while making his vehicle turn to the left, he simultaneously turned his head sharply to the right instead of looking where he was going.

Other portions of Defendant Killinger's affidavit and deposition testimony also lend support to a reasonable inference that a stop-sign violation did not provide a basis for his investigation of Plaintiff. Defendant Killinger indicated that, prior to his encounter with Plaintiff on November 12, 2000, he had received a call from another officer regarding an alleged bicycle theft and was patrolling the neighborhood on the lookout for a suspect in that theft. When he allegedly looked through his rear-view mirror and saw Plaintiff gesturing at him after he had turned onto Lomas, he decided to approach her because he thought she might have information regarding the bicycle-theft call that he was investigating. He did not raise the issue of whether Plaintiff had stopped at the stop sign until after Plaintiff accused him of not using his turn signal. (Killinger Aff. ¶¶ 2-4; Killinger Dep. 5-20-02, at 11, 18-19; Ex. D. to Def. Killinger's Mem. at 3.)

Defendant Killinger admits that he had no basis for suspecting Plaintiff was a bicycle thief, as she "was wearing bicycle riding attire" and "was actually driving toward the scene of the crime" rather than away from it. (Killinger Dep. 5-20-02, at 10.) Moreover, based on the undisputed facts and evidence of record, it was readily apparent at the inception of the encounter that Plaintiff did not holler at Defendant Killinger in order to flag him down for the purpose of offering information about a bicycle theft, but rather to complain about the

officer's failure to use his turn signal.  Thus, the evidence of record regarding the alleged bicycle-theft investigation does not provide the reasonable suspicion necessary to justify detaining Plaintiff for further questioning.

Plaintiff alleges that, in the process of detaining her, Defendant Killinger grabbed her by her bicycle helmet (which she was wearing at the time), threw her bicycle to ground and stepped on it, pushed Plaintiff to the ground, struck her in the chest, and eventually placed her in handcuffs.  (Shane Aff. 6-4-01, ¶¶ 11-15, 19; Shane Dep. at 65-70, 75, 157-58, 160-62.)  The use of such forceful techniques does not necessarily fall within the limited scope of an investigative detention based on reasonable suspicion.  See United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994).  In this case, this evidence of record viewed in the light most favorable to Plaintiff indicates that she stood five feet six inches tall, weighed 122 pounds, and was dressed in bicycling attire when she confronted Defendant Killinger about his failure to use a turn signal on an uncrowded street corner in broad daylight on a Sunday morning. (Shane Aff. 6-4-01, ¶¶ 19, 52-53.)  The evidence of record does not indicate that Plaintiff was suspected of committing a violent offense or that she posed a threat to the officer's safety.  Rather, she was simply upset about Defendant Killinger's failure to use a turn signal and may have used profanity and threatened to file a complaint against him.  For these reasons, the Court concludes that Defendant Killinger's actions in forcibly detaining Plaintiff quickly exceeded the permissible scope of an investigative detention and became a full custodial arrest.

Generally, a full custodial arrest conducted without a warrant in a public place requires probable cause.  See United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001); United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998).  Under some circumstances, evidence of a traffic or equipment violation can provide probable cause for a full custodial arrest.  See, e.g., Atwater, 532 U.S. at 354.  In this case, however, there are limits on the proper scope and duration of such an arrest.

Under New Mexico's Motor Vehicle Code, failure to stop at a stop sign (as required by N.M. Stat. Ann. § 66-7-345(C)) is defined as a "penalty assessment misdemeanor."  N.M. Stat. Ann. § 66-8-116(A) (Michie 1978 & Supp. 2002).  Another provision of the Motor Vehicle Code generally requires the arresting officer to release a person from custody after issuing a uniform traffic citation for such an offense and obtaining the person's promise to appear in court at a later date or pay the penalty assessment.  See N.M. Stat. Ann. § 66-8-123 (Michie 1978 & Supp. 1998).  Thus, unlike the Texas statute at issue in Atwater, 532 U.S. at 323 (citing Tex. Tran. Code Ann. § 543.001 (1999)), the New Mexico Motor Vehicle Code generally does not provide authority for detaining a person any longer than necessary to issue a uniform traffic citation for this type of traffic violation.

This limitation on the scope and duration of an arrest for a routine traffic violation accords with the general rule expressed by the Tenth Circuit that a routine traffic stop must end promptly as soon as the traffic citations have been issued and the driver's license, registration, and insurance information have been reviewed and found to be in proper order.

See United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998).  The Tenth Circuit has not retreated from this rule in the wake of Atwater.  See Holt, 264 F.3d at 1221.

In this case, the evidence of record viewed in the light most favorable to Plaintiff supports a reasonable inference that probable cause to arrest her for a traffic violation or some other criminal offense was lacking in this instance.  As noted above, Defendant Killinger's account of the arrest contains inconsistencies which, when viewed in the light most favorable to Plaintiffs, are sufficient to create genuine issues of material fact that preclude summary judgment in his favor.

For example, although Defendant Killinger claims that he responded to Plaintiff's accusations regarding the use of his turn signal by accusing her of running a stop sign, he admits in his deposition testimony that the stop-sign violation did not provide the basis for his initial decision to approach her and that he never made any attempt to cite her for the alleged stop-sign violation.  (Killinger Dep. 5-20-02, at 11, 16-17.)  As Defendant Killinger points to no evidence that he attempted to cite Plaintiff for a traffic violation, and he does not identify any requirement of New Mexico law that would entitle him to check a bicyclist's license, registration, or insurance under these circumstances, he is not in a position to argue that the need to write a traffic citation or review related documentation provides a basis for the continued detention of Plaintiff in this case.

If, however, an officer develops a reasonable suspicion that other criminal activity is afoot during the course of a routine traffic stop, the Tenth Circuit has recognized an exception to the general rule that the stop must end promptly as soon as a traffic citation has

been issued.  See Hunnicutt, 135 F.3d at 1349.  Defendant Killinger asserts that his conduct

falls under this exception because he developed suspicions regarding other criminal offenses

while he was questioning Plaintiff.

First, he initially stated in his affidavit that one of the reasons for the arrest was that

Plaintiff committed a battery by repeatedly jabbing him in the chest with her finger (Killinger

Aff. ¶¶ 25, 30-31; see also Ex. D to Def. Killinger's Mem. at 8.)  Defendant Killinger is not

entitled to summary judgment on this theory, however, because Plaintiff disputes that she

ever initiated any physical contact with him, and he later admitted in his deposition

testimony that Plaintiff only jabbed her finger "towards my chest" and that "[s]he didn't

batter me a second time."  (Shane Dep. at 73; Killinger Dep. 5-20-02, at 49.)

In his deposition testimony, Defendant Killinger also indicated that his allegations of

battery did not provide the reason for arresting Plaintiff.  Rather, he stated that:  "I placed

her under arrest after she walked into traffic on Lomas."  (Killinger Dep. 5-20-02, at 49.)

Plaintiff denies that she walked into traffic.  Rather, she claims that she attempted to walk

on the sidewalk to the back of Defendant Killinger's vehicle in order to get his license plate

number.  (Shane Aff. 10-30-02, ¶¶ 2-3; Shane Dep. at 75.)  Thus, there are disputed issues

of material fact which preclude summary judgment in Defendant Killinger's favor on this

theory as well.

Another reason that Defendant Killinger articulated for continuing to detain Plaintiff

was that he needed to get her name because she was threatening to file a complaint against

him for not using his turn signal.  (Killinger Dep. 5-20-02, at 17-18, 21.)  Defendant

Killinger offers no legal authority, however, for the proposition that the threat of a citizen's complaint against a police officer provides that officer with probable cause to arrest a citizen.

Finally, Defendant Killinger asserts that he was justified in arresting Plaintiff because he developed probable cause to believe that she may have committed the offenses of concealing her identity or resisting a police officer during his interaction with her.  See, e.g., N.M. Stat. Ann. § 30-22-1 (Michie 1978 & Supp. 1994) (resisting, evading, or obstructing an officer); N.M. Stat. Ann. § 30-22-3 (Michie 1978 & Supp. 1994) (concealing identity). In this regard, Defendant Killinger correctly notes that a law enforcement officer may be entitled to qualified immunity when he or she develops probable cause to arrest an individual for these offenses *after* the individual is lawfully detained for some other reason.  See Albright v. Rodriguez, 51 F.3d 1531, 1536-37 (10th Cir. 1995) (holding that a law enforcement officer was entitled to qualified immunity when the arrest for concealing identity and obstructing the officer took place after the offender was lawfully detained at a United States Border Patrol checkpoint).

It does not follow, however, that the Fourth Amendment permits a law enforcement officer to detain an individual for the sole purpose of requesting identification and then arrest that individual if he or she refuses to cooperate.  It is clearly established that such suspicionless "stop and identify" procedures are unconstitutional.  See Brown v. Texas, 443 U.S. 47, 51-52 (1979).  The Supreme Court "has consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."  Florida v. Bostick, 501 U.S. 429, 437 (1991).  The Tenth Circuit also

has recognized that "the Fourth Amendment does not permit officers to arrest an individual simply because he or she refuses to present identification when the officers have no basis whatsoever to suspect the individual of criminal conduct to support the initial detention." Oliver, 209 F.3d at 1187; see also id. at 1188 n.7 (noting that officers do not have "carte blanche to stop any individual, regardless of the circumstances, in order to demand identification").

Unlike the plaintiff in Albright, 51 F.3d at 1536-37, Plaintiff in this case was not lawfully detained at a Border Patrol checkpoint at the time Defendant Killinger questioned her about her identity.  She has presented evidence that is sufficient to create a genuine issue of material fact as to whether Defendant Killinger lacked an objective, reasonable basis for detaining her prior to such questioning.   Thus, for purposes of defeating Defendant Killinger's summary-judgment motion, Plaintiff has shown that Defendant Killinger's argument suffers from the same flaw as the State of Texas's argument in Brown, 443 U.S. at 51-52, namely that "none of the circumstances preceding the officers' detention . . . justified a reasonable suspicion that [s]he was involved in criminal conduct."

The contours of this right were "sufficiently clear that a reasonable official would understand that what he [did] violate[d] that right."   Anderson, 483 U.S. at 640. Accordingly, Defendant Killinger is not entitled to summary judgment on Plaintiff's claim of unlawful detention.

## 2. **Excessive Force**

Defendant Killinger next argues that Plaintiff's claim of excessive force must fail because the parties have stipulated that she suffered no physical injuries as a result of the incident which required medical treatment. (Ex. E. to Def. Killinger's Mem.) In support of this claim, Defendant Killinger cites authorities from the Fifth and Eleventh Circuits for the proposition that "the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000); see Williams v. Bramer, 180 F.3d 699, 703-04 (5th Cir. 1999).

In the Tenth Circuit, however, a finding of excessive force is not necessarily foreclosed by the fact that the plaintiff did not suffer a physical injury. See Holland v. Harrington, 268 F.3d 1179, 1195 (10th Cir. 2001). "[T]he interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property, and privacy interests--a person's 'sense of security' and individual dignity." Id. Recognition of such interests is "clearly established," id. at 1197; see also id. at 1195 (citing Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971); Baker v. Monroe Township, 50 F.3d 1186 (3d Cir. 1995); and McDonald v. Haskins, 966 F.2d 292 (7th Cir. 1992)).

Plaintiff has presented evidence that these protected interests were violated by Defendant Killinger's conduct. In particular, she presented evidence that Defendant Killinger grabbed her by the head, stepped on her bicycle, pushed her to the ground, pushed on her chest, and struck her breast in a manner that caused a bruise. (Shane Aff. 6-4-01, ¶

-20-

23; Shane Dep. at 65-70, 75, 157-58, 160-62.)  In the context alleged in this case, the Court concludes that intentionally touching or striking a woman's breast is the type of conduct which offends "a person's 'sense of security' and individual dignity," Holland, 268 F.3d at 1195, and which may fall within the legitimate boundaries of an excessive-force claim under the Fourth Amendment for that reason.

Further, the authorities cited by Defendant Killinger in support of his "de minimis injury" theory are distinguishable insofar as they involved the use of force *after* the officers already had established probable cause for the arrest. See, e.g., Nolin, 207 F.3d at 1258 (noting the district court's finding that the force at issue was used during the course of a "lawful arrest").  In this case, the evidence of record viewed in the light most favorable to Plaintiff gives rise to a reasonable inference that there was no probable cause to arrest her in the first place.  If the use of force to detain Plaintiff was not justified in the first place, then the degree of force used was excessive.  See Thornton v. City of Macon, 132 F.3d 1395, 1400 (11th Cir. 1998).  Although the doctrine of qualified immunity gives considerable leeway for officers to use force in executing a lawful detention, see Saucier, 533 U.S. at 205. it would be unreasonable for an officer to conclude that the degree of force alleged here was necessary when there was no legal justification to detain an individual in the first place, see Sheth v. Webster, 145 F.3d 1231, 1238 (11th Cir. 1998).

Accordingly, the Court concludes that Plaintiff has met her burden of showing the presence of a genuine issue of material fact concerning whether Defendant Killinger violated

-21-

her clearly established rights under the Fourth Amendment.  It follows that Defendant Killinger is not entitled to summary judgment based on a qualified immunity defense.

### 3.     State Law Claims

Defendant Killinger alleges that Plaintiff's state law claims of assault, battery, false arrest, and false imprisonment are subject to dismissal because he had legal justification for his conduct and good faith defenses.  See generally  State v. Johnson, 1996-NMSC-075, ¶ 16, 122 N.M. 696, 930 P.2d 1148 ("[A] common-law defense to a civil wrongful arrest or a false imprisonment suit . . . requires only that the officer prove that he or she acted in good faith and with probable cause and therefore lawfully under the circumstances.").  Based on the above analysis of Plaintiff's federal civil-rights claims against Defendant Killinger, the Court concludes that there are genuine issues of material fact concerning Defendant Killinger's legal justification and good-faith defenses for his actions.   Accordingly, Defendant Killinger's summary-judgment motion is denied as to Plaintiff's state-law claims as well.

### C.     ***Defendants' Motion for Partial Summary Judgment Requesting Dismissal of Plaintiff's Municipal Liability Claim and of her Claims Against Defendant Garcia***

Defendants City of Albuquerque and Sergeant Garcia also have moved for partial summary judgment regarding Plaintiff's federal civil-rights claims.  As Sergeant Garcia already has been dismissed as a party to this action by stipulation, his motion for summary judgment is now moot, and the Court will not address the arguments raised therein on his behalf.  In addition, the Court will not further address those arguments advanced by the City

which are premised on the assertion that Defendant Killinger committed no constitutional violation in this case.  Those arguments are foreclosed by the above analysis of Defendant Killinger's summary-judgment motion.  The only dispositive matter raised in the parties' motions that remains to be decided at this time is the City's argument that it is entitled to summary judgment on Plaintiff's municipal liability claims under 42 U.S.C. § 1983.

The City argues that it is entitled to summary judgment on these claims because Plaintiff has not shown that she was injured by an illegal policy or custom of the City which evinces a deliberate indifference to the rights of its inhabitants, and because Plaintiff has not established that the City is liable based on any failure to train or supervise its employees. In response to the City's motion, Plaintiff argues that Police Chief Polisar's decision not to terminate Defendant Killinger's employment constitutes the illegal policy or custom that caused the constitutional violation in this case.  Plaintiff also argues that the City failed to train and discipline its officers, and that such failure rose to the level of deliberate indifference towards the rights of its citizens.

A municipality may be held liable under 42 U.S.C. § 1983 only for its own unconstitutional or illegal policies and not for the tortious acts of its employees.  See Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 694 (1978); see also Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1998).  In order to prevail on a claim of municipal liability, a plaintiff must prove his or her constitutional injury was inflicted "pursuant to government policy" or custom.  Monell, 436 U.S. at 691.  In particular, a plaintiff must show the existence of a municipal custom or policy, and a direct causal link between the custom

or policy and the alleged violation.  See City of Canton v. Harris, 489 U.S. 378, 385 (1989).

In order to attribute such a policy, practice, or custom to the municipality, a plaintiff must

show that a policy-maker for the municipality authorized policies that led to the violations

or permitted practices that were so permanent and well settled as to establish acquiescence.

See Baker, 50 F.3d at 1191.  Where a plaintiff seeks to establish municipal liability on the

theory that a facially lawful municipal action has led an employee to violate a plaintiff's

rights, he also must demonstrate that the municipal action was taken with deliberate

indifference to its known or obvious consequences.  See Bd. of County Comm'rs of Bryan

County v. Brown, 520 U.S. 397, 407 (1997).

Generally speaking, a municipality can be liable in three possible ways: (1) by

showing an unconstitutional policy or acts officially sanctioned or ordered by the

municipality's final policy-making authority; (2) by showing custom established by proof

of knowledge and acquiescence; and (3) by showing failure to train.  Under the first of these

theories, a municipality may be held liable for acts officially sanctioned or ordered by its

final policy-making authority.  See Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81

(1986) (plurality opinion).  Under the second theory, a municipality may be liable for

constitutional deprivations "visited pursuant to governmental 'custom' even though such a

custom has not received formal approval through the body's official decision[-]making

channels."  Monell, 436 U.S. at 691; see Pembaur, 475 U.S. at 481-82 n. 10 (holding that the

custom may be established by proof of knowledge and acquiescence); Fletcher v. O'Donnell,

867 F.2d 791, 793-94 (3rd Cir. 1989).  Under the third theory, inadequacy of training may

serve as the basis for Section 1983 liability if the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.  See City of Canton, 489 U.S. at 388.

There must be an affirmative link between the policy or custom and the particular constitutional violation alleged.  See City of Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985).  A causal connection between the unconstitutional act and the authorized decision makers may be established when the governing body has exercised its decision-making authority with deliberate indifference to the constitutional rights of those affected by its decisions.  See Ware v. Unified Sch. Dist. No. 492, 902 F.2d 815, 819 (10th Cir. 1990).

> The plaintiff must . . . demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

Brown, 520 U.S. at 404.

### 1.    Municipal Policy or Custom

The City argues that Plaintiff cannot cite any specific policy, written or otherwise, which shows that a municipal policy or custom was the moving force behind any alleged constitutional deprivation in this case.  The City also argues that its written policies pertaining to training, use of force, and investigation of allegations of police misconduct are lawful on their face.   The City further contends that Plaintiff fails to demonstrate a direct causal link between its policy and the alleged constitutional deprivation.  (Def. City's Mem. at 7; Ex. D, F, G to Def. City's Mem.)

Plaintiff alleges that Chief Polisar knew of Defendant Killinger's history of excessive use of force on prior occasions with various other citizens, but was deliberately indifferent in not following a recommendation that Defendant Killinger be terminated from service. Plaintiff contends that Chief Polisar was the final policy-maker who had power to establish standards of conduct for the Albuquerque Police Department and, therefore, his decision not to terminate Officer Killinger constituted the final, official policy. Plaintiff also argues that the City's general policy of not providing supervisors like Sergeant Garcia with information about Defendant Killinger's alleged prior misconduct also contributed to her constitutional injury.

Plaintiff primarily relies on evidence of acts and omissions by the City concerning internal investigations performed by the City's internal affairs unit. In particular, Plaintiff argues that the City's decision not to terminate Defendant Killinger's employment in light of the information resulting from these investigations amounted to a deliberate policy choice by the City, which was the cause of her injury. This internal-affairs information is the subject of a separate *Sealed Order* of this Court entered concurrently herewith, and it will not be repeated here.

Nevertheless, the Court has reviewed the evidence submitted by Plaintiff, including that which has been placed under seal. Based on that review, the Court concludes that the evidence does not support Plaintiff's contention that the City was deliberately indifferent to the information it received about Defendant Killinger. Rather, the evidence of record shows that the City did not condone the use of excessive force, but instead took disciplinary action

against Defendant Killinger where appropriate. The fact that the City chose an alternative other than terminating Defendant Killinger's employment does not give rise to a reasonable inference that the City was deliberately indifferent to police misconduct.  A city cannot be held liable under the theory of municipal liability articulated in Monell for failure to discipline in a specific instance in a specific fashion.  See Santiago v. Fenton, 891 F.2d 373, 382 (1st Cir. 1989) (citing Kibbe v. City of Springfield, 777 F.2d 801, 809 n. 7 (1st Cir. 1985)).

Further, the relationship between Defendant Killinger's conduct in this case and any allegations of prior misconduct is too attenuated to establish a causal connection between a municipal policy or custom and the injury alleged here.  In this regard, the Court notes Sergeant Garcia's deposition testimony that he had no problems with Defendant Killinger while Defendant Killinger was on his squad, and that the prior incidents involving Defendant Killinger occurred more than two years before the incident which is the subject of Plaintiff's Complaint.  (Garcia Dep. at 11; Ex. D to Pltf.'s Resp. to Def. City's Mot.).

Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known consequence of his action.  See Brown, 520 U.S. at 410.  This Court concludes that Plaintiff's evidence does not give rise to a reasonable inference of deliberate indifference on the part of the City in establishing policies or customs which bear on the constitutional violation alleged here.  See Ware, 902 F.2d at 819.

2.     **Failure to Train or Supervise**

Plaintiff also asserts that the City is liable under 42 U.S.C. § 1983 on the basis of failure to adequately train and supervise officers in the proper use of force. Inadequate police training may result in municipal liability under this statute "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton, 489 U.S. at 388-89. The issue is not whether the training program is inadequate. The question is whether such inadequate training can justifiably be said to represent the City's policy. See id. at 389.

To establish a deliberate or conscious choice or deliberate indifference, a plaintiff must meet a four-part test. See Myers v. Oklahoma County Bd. of County Comm'rs, 151 F.3d 1313, 1318 (10th Cir. 1998). A plaintiff must show that:

> (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city towards persons with whom the police officers come into contact; and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

Id.; see also Parrish v. Luckie, 963 F.2d 201, 204-05 (8th Cir. 1992) (holding that a municipality was liable under Monell when the plaintiffs have produced "detailed and compelling" evidence of the police department avoiding, ignoring, and covering up complaints of misconduct by its officers).

Plaintiff fails to establish the third and fourth elements of this test. It is undisputed that the City has a written policy of not resorting to excessive force unless absolutely

warranted.  (Ex. F. to Def. City's Mem.)  Plaintiff's evidence that the municipality knew of

a need to train and/or supervise, but made a deliberate choice not to take any action, largely

consists of citations to other lawsuits that were brought against various police officers

including Defendant Killinger.  With regard to these lawsuits, Plaintiff has not directed the

Court to any finding indicating that the City was liable.  Rather, Plaintiffs only point to the

fact that some of these lawsuits were settled out of court.  In the absence of evidence creating

a material issue regarding whether liability was established in the other lawsuits, the fact that

other lawsuits were filed against Defendant Killinger or other officers does not demonstrate

that the City improperly failed to discipline him or the other officers.  See Jojola v. Chavez,

55 F.3d 488, 491 (10th Cir. 1995); Mettler v. Whitledge, 165 F.3d 1197, 1205 (8th Cir.

1999).  Further, Plaintiff failed to demonstrate that not providing additional training to

Officer Killinger amounted to a "conscious" choice or policy of the City.    Summary

judgment is therefore granted to the City on Plaintiff's municipal liability claim under 42

U.S.C. § 1983.

### D.    *Defendant Bryan Killinger's Motion to Bifurcate Trial*

Defendant Killinger has moved to bifurcate the trial of Plaintiff's claims against him

from the trial of Plaintiff's municipal liability claims against the City under 42 U.S.C. §

1983.  Because the Court grants summary judgment in the City's favor as to these claims,

this motion is denied as moot.

E.    ___Defendant City of Albuquerque's Motion for Separate Trials___

Defendant City of Albuquerque also contends that separate trials are warranted in this case because Plaintiff's evidence as to Defendant Killinger's use of excessive force will confuse the jury and unfairly prejudice the City.  Because the Court grants summary judgment in the City's favor on Plaintiff's municipal liability claims under 42 U.S.C. § 1983, the City's motion for separate trials regarding those claims is moot.  Nevertheless, the Court briefly addresses whether there is a need for a separate trial concerning any state-law claims that remain pending against the City.

This Court has discretion to grant separate trials under Fed. R. Civ. P. 42(b) upon consideration of the need to prevent delay and prejudice and promote convenience, expedition, and economy.  In the present case, separate trials will not prevent delay and will not be conducive to convenience or economy of the Court.  These factors, therefore, weigh in favor of a single trial.

As to the risk of unfair prejudice and confusion of the jury, the Court finds that such risks are significantly reduced by eliminating the issue of the City's municipal liability under 42 U.S.C. § 1983 from the province of the jury, which the Court has done by granting summary judgment on this issue.  Further, the Court has a number of measures available that can prevent unfair prejudice to defendants and that are less burdensome than separate trials.  These measures include cautionary warnings, limiting instructions, and other instructions to the jury.  See Corrigan v. Methodist Hosp. 160 F.R.D. 55, 57 (E.D. Pa 1995).  Such

measures can and will be utilized at trial if necessary to prevent or minimize any claimed prejudice to the City.  Therefore, the City's motion for separate trials is denied.

## III.   **CONCLUSION**

For the foregoing reasons, the Court concludes that genuine issues of material fact preclude summary judgment as to Plaintiff's claims against Defendant Killinger, but that Defendant City of Albuquerque is entitled to summary judgment as to Plaintiff's municipal liability claims under 42 U.S.C. § 1983.  The Court further concludes that bifurcation or separate trials are not warranted in this case.

**IT IS, THEREFORE, ORDERED** that *Defendants' Motion for Partial Summary Judgment Requesting Dismissal of Plaintiff's Municipal Liability Claim and of her Claims Against Defendant Garcia* (Doc. No. 95) is **GRANTED.**

**IT IS FURTHER ORDERED** that *Defendant Bryan Killinger's Motion for Summary Judgment* (Doc. No. 92)is **DENIED**.

**IT IS FURTHER ORDERED** that *Defendant City of Albuquerque's Motion for Separate Trials* (Doc. No. 97) is **DENIED**.

**IT IS FURTHER ORDERED** that *Defendant Bryan Killinger's Motion to Bifurcate Trial* (Doc. No. 90) is **DENIED**.

**SO ORDERED**, this 31st day of March 2003, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
*United States District Judge*